## THE DALZELLINE.

### THE LEVIATHAN.
### No. 13463.

District Court, E. D. New York.
May 19, 1936.

Burlingham, Veeder, Clark & Hupper and Stanley R. Wright, all of New York City, for libelant.

Haight, Griffin, Deming & Gardner, Henry M. Hewitt and James McKown, Jr., all of New York City, for United American Lines, Inc.

Tompkins, Boal & Tompkins and Arthur M. Boal, all of New York City, for United States Lines Co., claimant of S. S. Leviathan.

Kirlin, Campbell, Hickox, Keating & McGrann and Robert S. Erskine, all of New York City, for United States Lines Operations, Inc.

Clark, Carr & Ellis and P. A. Crouch, all of New York City, for Jarka Corporation.

CAMPBELL, District Judge.

This suit arises out of a collision between the steam tug Dalzelline and a float stage at Pier 86, North river, while the Dalzelline was assisting with the undocking of the steamship Leviathan on November 25, 1930.

The Jarka Corporation was made a party respondent after United American Lines, Inc., filed an answer to the original libel, alleging that the float stage in question was "placed and/or moored by The Jarka Corporation."

The order permitting the filing of the amended libel allowed the answers to the original libel to stand as answers to the amended libel.

The incorporation and the relation of the parties at all the times hereinafter mentioned and at the time of the trial is as follows:

Libelant is managing owner both of the steam tug Dalzelline and of the steam tug Dalzellace, and the steam tug Dalzelline was up to the time of the collision hereinafter described, tight, staunch, strong, and in all respects seaworthy.

United States Lines Company was the owner of the steamship Leviathan, and the steamship Leviathan was during the currency of process hereunder within this District and within the jurisdiction of this court.

Respondent United American Lines, Inc., was a Delaware corporation with offices in the borough of Manhattan, county and state of New York.

Respondent United States Lines Operations, Inc., was a New York corporation having its offices in the borough of Manhattan, county and state of New York.

Respondent the Jarka Corporation was a Delaware corporation having an office in the borough of Manhattan, county and state of New York.

Pier 86 North river was at the time of the collision leased by the city of New York to respondent United American Lines, Inc., and the respondent United States Lines Operations, Inc., hired the pier from time to time for docking the Leviathan, the pier staff and employees remaining those employed by United American Lines, Inc., and respondent the Jarka

Corporation, to which it contracted the stevedoring at the Pier 86, its duties including the handling of lines to the ships docking at the pier and the placement and mooring of float stages.

The float stages in question were owned either by United States Lines Operations, Inc., or an affiliate, United States Lines Company. They were not owned by respondent the Jarka Company. The float stages were especially built for the Leviathan and were larger than ordinary float stages being 30 x 14 x 10. When the Leviathan was coming into dock, they were moved from the bulkhead and moored in specified positions at the south side of the pier, to act as fenders in preventing the ship from coming into contact with the pier. When the Leviathan was not in, they were kept at the bulkhead or at the end of the pier. The float stages were known to be in this position and they were floating out of water and fully visible.

The large float stages were equipped by their owner with four mooring lines permanently sheckled to eyebolts at corners of the float. These lines were of 3/4 inch wire cable, about 6 fathoms in length, at the end of which was spliced 4-inch manila rope for handling. In mooring the Leviathan, these were run to bollards or bitts on the string piece of the pier about 20 feet from each end of the float stage. Some slack on these was necessary to allow them to play when the ship bore down on them, and to allow for a 4.3 feet rise and fall of the tide and swell of the river and the surge of these outward, to a limited distance, when a ship undocked was a known and anticipated occurrence to tugmen.

The Leviathan sailed from the south side of Pier 86, North river, about 1:30 p. m., November 25, 1930, backing out of the slip under her own power, assisted by five tugs. The tide was about high-water slack or last of the flood. Pier 86 is 1,000 feet long, and the Leviathan 950 feet long, 100.6 feet beam. One large float stage (30 x 14 feet) lay about 230 feet from the bulkhead and another at the middle of the pier. A third large float stage was nearer the river end; a "bumper" or "column fender" was near the extreme end of the pier, and one smaller float stage was somewhere in between.

Two of the assisting tugs followed the ship out from the end of Pier 86, head-on to the quick water from her propellers; a Barrett tug headed out of the slip, going

full speed ahead with a line from the Leviathan's starboard bow; the Dalzelline and Dalzellace lay bow on to the ship's starboard bow, and, by working slow ahead as the ship backed away from the bulkhead, swung around into position to follow the ship straight out of the slip. The Dalzelline placed her bow fender against the ship's port bow 6 to 20 feet from the stem and the Dalzellace placed her bow fender directly on the ship's stem. Various witnesses estimated that the Leviathan was making 4 to 10 knots sternway by the time she was half way out of the slip. To keep up with her, the smaller tug Dalzelline was going full speed ahead and the Dalzellace at half speed.

As the Dalzelline's bow was nearly abreast of the inshore end of the middle float stage, it started to swing out from the pier, whereupon the master of the Dalzelline immediately rang for stop and full speed astern. The engineer stopped the engines and checked her headway enough to drop back a few feet from the Leviathan's bow, but the operation of reversing the engine required a few seconds and, before this could be accomplished, the float stage swung out to an angle variously estimated at 30° to 90° and struck the Dalzelline's starboard side about 25 to 35 feet from the stem. The Dalzellace also stopped, made fast to the Dalzelline, and assisted her across the river, where she was beached on the Weehawken flats.

It is impossible to reconcile the testimony of the witnesses for United States Lines Operations, Inc., with the testimony of Jarka's witnesses, as to the positions of the tugs and the angle to which the float stage swung.

On all of the evidence I am convinced that the float stage in question swung out to an angle of at least 30°, and probably about 50–60° before striking the Dalzelline. No witness had a better opportunity to observe the swing of the float stage than the chief officer of the Leviathan who was standing on the bow looking directly down on the tugs, and said that he heard the crash, and saw that the float stage "had taken a position at right angles to the pier." The general manager for the United States Lines Operations, Inc., fixed the angle at 30–35 degrees and the marine superintendent of the United States Lines Operations, Inc., fixed the angle at 30 degrees. The tug's witnesses estimated the angle from 45° to 60°. I cannot accept as true the estimates of the Jarka's witnesses as to the extent of the swing of the float stage.

The float stage in question swung out at least 14 feet and probably 20 feet, but there should not have been a slack in the lines of the float stage of over 7 feet. The Dalzellace's bow fender was up against the Leviathan's stem and the Dalzelline's bow fender was up against the Leviathan's port bow 6 to 20 feet from the stem. Both tugs were in line with the Leviathan, heading about straight out of the slip. The beam of the Leviathan is 100.6 feet, that of the Dalzellace 24.7 feet, and that of the Dalzelline 22.4 feet. The width between the center line of the Leviathan and her port side was 50.3 feet, from which deduct 12.4 feet, one-half of the Dalzellace's beam, 5 inches for wooden fenders, and 22.4 feet the Dalzelline's beam, which would leave a clearance of over 14 feet between the Dalzelline and the float stage, if the float stage remained alongside the pier in its usual position. As the Leviathan eased away from the float stages after her lines were let go, and backed out her bow went further away from the pier. The contention that the Dalzelline was at such an angle that she crashed broadside into the float stage in its normal position is not sustained, but is entirely disproved by the fact that the contact was 25–35 feet from the Dalzelline's stem, and further by the fact that at the speed at which the Leviathan was backing out, which was at almost as high speed as the Dalzelline could make, it would have been impossible for the Dalzelline to go out at any appreciable angle to the Leviathan's port side, and with the point of contact 25–35 feet from the Dalzelline's stem, even if her stem was against the port side of the Leviathan 6 feet from that vessel's stem, the point of contact would have been well within the line of the ship's beam. The contention that the Dalzellace hit the Dalzelline at right angles or any other angle, and the Dalzelline's stern moved over about 30 degrees and hit the float stage, is not sustained. Blau, who so testified, admitted on cross-examination that the angle he described would bring the Dalzelline's stern only about in line with the Leviathan's port side amidships, and, further, it is clear to me, that this contention is disproved by the point of contact. The injury to the Dalzelline was caused by the float stage swinging out a minimum of 14 to 20 feet

and probably 20 to 30 feet before the impact.

The Jarka's witnesses testified that most of the slack in the float stage's lines was taken up before the Leviathan started backing out of the slip. I accept that testimony as true as that was the advisable thing to do with a ship sailing at high water, to prevent the float stage weighing several tons gathering too much momentum due to too much slack, and fetching up on the lines with a jerk. Accepting as true the testimony that the slack had been taken up, it was impossible to account for the float stage's sagging out even 8 or 10 feet, and certainly no amount of slack in the lines could account for a 30–35° angle of the float stage. On all the testimony it seems clear to me that there must have been a rendering or parting of one or more of the lines of the float stage in question, and a swinging out of the float stage before the contact. Notwithstanding the testimony of the Jarka's witnesses that the lines did not part or render, the inference that the lines parted or rendered is supported by the testimony of three of the Jarka's witnesses that the lines would have had to part or render to permit the float stage to swing out 30° more, and that is the angle which I have fixed as the minimum that it did swing out. Whatever the cause, the swingout of the float stage made it a menace to navigation, and a hazard not reasonably to be anticipated by the tugs. What I said in Luckenbach S. S. Co. v. Cahill Towing Line et al., 1926 A.M.C. 1153, and in William Spencer & Son Corp. v. Lamport & Holt, Ltd., and New York Dock Company, 1934 A.M.C. 930, neither of which was reported in full, is applicable here.

The two tugs Dalzelline and Dalzellace, as is customary, were following the Leviathan out of the slip, so as to keep the bow under control against the tide, or if the ship had to stop her engines to allow for traffic in the river, and also to be in position to start turning the ship at once when she reaches the specially dredged turning basin off the pier end.

On conflicting evidence, I find that both tugs were about in line with the Leviathan.

I reject both of the irreconcilable versions of witnesses for different respondents, first, that the Dalzelline was first observed in proper position, but that she was pushed out of position by the Dalzellace, second, that the Dalzellace was in proper position, and that the Dalzelline got out of position while trying to get ahead of the Dalzellace. Both of these versions are improbable. The accident occurred about 500 feet from the bulkhead. The tugs would have been in position to follow the Leviathan soon after she was 100 feet from the bulkhead. That the Leviathan's suction might pull one of the float stages adrift was the only danger involved in the Dalzelline's position, but that was not reasonably to be anticipated, as it could be and in the light of experience would be avoided by making the lines fast properly. Luckenbach Steamship Co. v. Cahill Towing Line, supra. There was evidence on the part of experienced seamen that they had never seen a float bridge swing out so far. The Dalzelline was not at fault.

On conflicting evidence, I find that the Dalzellace was coming out in line with the Leviathan, with the bow fender of the Dalzellace up against the Leviathan's stem until just before the collision, when the Dalzellace stopped her engines and fell back.

The Dalzellace did not interfere with the Dalzelline's maneuvering as the Dalzelline had 38 feet, plus the distance of the ship from the float stage, in which to maneuver, and it seems clear to me that the Dalzelline could not have been at more of an angle than 5 to 10° and been able to follow as she did.

The Dalzellace was without fault, and it is to be noted that the Dalzellace was not impleaded by any respondent, and in none of the pleadings of any of the respondents herein was she charged with any fault.

The deck hand of the Dalzelline, who was on her forward deck, testified that he "saw the float stage in alongside the dock," and that when he noticed it particularly "it was adrift, coming out * * *"; further, that "I just hollered out, I says, 'Look out, there she goes;' and it was an instant it broke adrift and swung out." Capt. Maloney's description of the "tremendeous outward surge" when the Leviathan started backing shows that the float stage was bound to swing out rapidly. That Capt. Maclary did not hear (or did not remember) the deck hand's shout is not proof that the deck hand did not shout,

126

but in any event Capt. Maclary and the deck hand must have seen the float stage start to swing out at the same time, and the Captain immediately rang for stop and reverse. The engines were stopped, but probably did not go astern in the few seconds that elapsed before the collision occurred.

The Dalzelline dropped back clear of the ship, and that shows that she acted promptly in trying to avoid collision with the float.

The S.S. Leviathan was backing out at her usual and proper speed and is without fault.

■ The respondent United American Lines, Inc., was the lessee of the Pier 86, but had no duty as to the float stages which were special equipment, and is without fault.

■ The respondent the Jarka Corporation tended the lines and placed the float stages and was responsible for the moorings and is at fault for the negligent manner in which the float stage in question was moored, and is primarily liable.

■ The respondent United States Lines Operations, Inc., ordered the tugs, and, as owner, bailee, or custodian in possession of the float stage and its lines, was under a duty to keep it properly moored to prevent it becoming a menace to navigation in the slip. William Spencer & Son Corp. v. Lamport & Holt and New York Dock Co., 1934 A.M.C. 930, and is secondarily liable.

A decree may be entered in favor of the libelant against the respondent the Jarka Corporation as primarily liable, and the respondent United States Lines Operations, Inc., as secondarily liable, with costs and the usual order of reference, and in favor of the United States Lines Company, claimant of the steamship Leviathan, and the respondent United American Lines, Inc., dismissing the libel as to them but without costs.

Settle decree on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Admiralty Rules (28 U.S.C.A. following section 723), submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court as provided by the Admiralty Rules of this court.